# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

MRO INDUSTRIAL SALES, LLC,

        Plaintiff,


v.

                **MEMORANDUM OF LAW & ORDER**
                Civil File No. 12-2401 (MJD/JJG)


CARHART-HALASKA
INTERNATIONAL, LLC,

        Defendant and
        Third-Party Plaintiff,

v.

CHRIS E. CARHART,

        Third-Party Defendant.

Jessica L. Nelson, Kevin R. Coan, and Shushanie E. K. Liesinger, Hinshaw & Culbertson LLP, Counsel for Plaintiff MRO Industrial Sales, LLC and Third-Party Defendant Chris E. Carhart.

Jeffrey S. Nicolet and Matthew D. Resch, Wagner, Falconer & Judd, Ltd, Counsel for Defendant and Third-Party Plaintiff Carhart-Halaska International, LLC.

1

## I.    INTRODUCTION

This matter is before the Court on Plaintiff and Third-Party Defendant's

Motions for Summary Judgment.  [Docket No. 54]  Having received and

reviewed all of the parties' submissions regarding this motion, as well as the

entire record in this case, the Court concludes that oral argument is unnecessary

and will rule on the papers in this matter.  Because genuine issues of material fact

regarding what amount of commissions, if any, MRO is owed, and whether

Chris Carhart breached a contractual duty by failing to pay those commissions,

the Court denies summary judgment in this matter.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Parties

Chris Halaska ("Halaska") is the sole owner of Halaska International, Inc.

(Coan Aff., Ex. 2, Halaska Dep. 31.)  Third-Party Defendant Chris Carhart

("Carhart") is the sole owner of Carhart, Inc.  (Id.; Coan Aff., Ex. 1, Carhart Dep.

38.)  Carhart, Inc. imported industrial parts into the United States from China.

(Halaska Dep. 24.)  Halaska International, Inc. had connections in sales.  (Halaska

Dep. 23.)

In 2006, Halaska International, Inc. and Carhart, Inc. formed Defendant Carhart-Halaska International, LLC ("CHI") in order to expand and promote sales for certain Carhart, Inc. products.  (Carhart Dep. 39-43.)  Under CHI's Operating Agreement, Halaska and Carhart were both "Managers."  (Carhart Aff., Ex. 5, CHI Operating Agreement § 5.1.)  Managers had authority "to do on [CHI's] behalf all acts to carry out [CHI's] business as authorized by the WLLCL [Wisconsin Limited Liability Company Law], including, but not limited to, the right to . . . pay out of [CHI]'s funds all fees and expenses incurred in the organization of [CHI], as well as all operating expenses."  (Id. § 5.3(a)(v).)  The "Duties and Obligations of a Manager" include that "[a] Manager shall take all action that may be necessary or appropriate [] for [CHI]'s day-to-day operation and business in accordance with the provisions of this Operating Agreement and applicable laws and regulations."  (Id. § 5.5(a).)  However, the "Duties and Obligations of a Manager" do not explicitly include paying commissions to any entity.  (Id. § 5.5.)

> Managers are not liable
>
> for any act or omission pursuant to the authority granted to a Manager by this Operating Agreement if the Manager acted in good faith and in a manner he or she reasonably believed to be within the scope of the authority granted to him or her by this Operating

Agreement and in the best interest, or not opposed to the best interests, of [CHI], provided that the Manager shall not be relieved of liability in respect to any claim, issue, or matter as to which the Manager shall have been finally adjudicated to have violated section 183.0402 of the WLLCL.

(Id. § 5.7.)  And a "Manager shall not have the authority to [] do any act that is in contravention of applicable law or this Operating Agreement or that would make it impossible to carry on the ordinary business of [CHI]."  (Id. § 5.4(a)(i).)

Also in 2006, Michael Oldenburg formed Plaintiff MRO Industrial Sales, LLC ("MRO"), a Minnesota limited liability company, to act as a sales representative with various companies.  (Coan Aff., Ex. 3, Oldenburg Dep. 31-32; Coan Aff., Ex. 4.)  Halaska introduced Carhart to Oldenburg because he intended to use MRO to sell CHI's products to Terex/ASV, a large account of MRO's that was seeking a company to supply metal parts to it.  (Carhart Dep. 50; Halaska Dep. 26.)

According to Halaska, MRO is an "independent manufacturer's rep that [CHI] paid on a commission basis . . . to develop new business and get orders." (Halaska Dep. 53.)  MRO was CHI's only sales representative, and all sales completed on behalf of CHI came through MRO.  (Id.)  MRO introduced CHI to

its two most significant customers: Terex, previously ASV, and American

Hydraulics.  (Halaska Dep. 116-18; Oldenburg 29.)

### 2.     The CHI-MRO Oral Sales Representative Agreement

Halaska and Oldenburg orally negotiated the CHI-MRO sales

representative agreement.  (Halaska Dep. 56-57.)  There was no length of time

specified for the sales representative agreement; nor was there a specified

commission percentage.  (Id. 57.)  MRO would request a quote for a certain

product from CHI.  (Id. 59-60.)  CHI would forward the request to a

manufacturer in Beijing, China, and request a quote to deliver the product to

Minneapolis, duty paid.  (Id. 60.)  When CHI received the quote back, Halaska

would add a markup and send it to MRO.  (Id. 60-61.)  A typical markup was

between 10 and 25 percent.  (Id. 61.)  Before the price was submitted to the

customer, Halaska, on behalf of CHI, would contact Oldenburg and agree on a

commission percentage that MRO would receive for that particular product

order.  (Id. 62-63.)  The percentage would be based on the profitability to CHI; if

the profit margin was good then Halaska would give MRO a 5 percent

commission, but if the profitability was low, he would give MRO a lower

percentage commission.  (Id. 57-58; see also Oldenburg Dep. 70 (testifying that

MRO's commission percentage was from 3 to 6 percent, depending on the pricing).)  For each quotation that Halaska sent out, he would let Carhart or his wife, Kexin Carhart, know the commission percentage that they should apply for MRO.  (Halaska Dep. 64.)

Terex or American Hydraulics would then place an order for a product, and CHI would send the product to the customer and an invoice for the product, which the customer would have 30 days to pay.  (Halaska Dep. 54, 75.)  After the customer sent the check for the product and the check cleared in CHI's bank, MRO was paid the agreed percentage of the payment that came from the customer.  (Id.; Carhart Dep. 59-62.)

According to Oldenburg, CHI paid commissions to MRO by check on or about the last Wednesday of every month until July 2012.  (Oldenburg Dep. 66-67; see also Carhart Aff., Ex. 1.)  Carhart or his wife, Kexin Carhart, made the actual commission payments to MRO.  (See Halaska Dep. 64; Oldenburg Dep. 39-40.)

The parties dispute whether MRO's commission was earned upon CHI's receipt of the order or upon its receipt of payment from the customer.  (Compare Carhart Dep. 62 ("Payments are made for product that was delivered, invoiced,

and collected – an invoice is collected from a customer, but commissions are

actually earned based on receipt of the order."); <u>with</u> Halaska Dep. 113 ("They

[MRO's commissions] are earned when the check is received from the

customer."), 124-25 ("An order could come maybe once every two years. . . .

You could give us an order now in June, saying 'Starting in January 2014 ship us

100 parts every month' . . . An order could have a bunch of different parts on it.

We look at shipments per month. And that's what Mike was paid off of, was

receiving payment for the shipments that were made. . . . [Oldenburg] was never

compensated on an order, because an order is nothing. An order can be

canceled, no parts are made, nothing.""), 155-58 (testifying that CHI never paid

MRO on orders, except one initial time, when CHI was starting and needed

capital to make the requested products, and Terex (then ASV) paid the invoice in

advance of shipping).)

### 3. Termination of MRO as Sales Representative

At some point, Halaska had the idea to terminate MRO as a sales

representative, using the law firm of von Briesen & Roper to handle to

termination, and Carhart agreed. (Halaska Dep. 92; Carhart Dep. 99-100, 104.)

Carhart instructed Halaska to proceed with the termination and to "keep me out

of it." (Halaska Dep. 105.) Carhart had no concerns about terminating MRO before the termination occurred. (Carhart Dep. 116.)

Carhart testified that terminating MRO "was my opinion and my decision." (Carhart Dep. 80.) He believed that terminating MRO was appropriate because he thought that he could service the Terex account himself without MRO and without CHI. (Carhart Dep. 80-81.) He also thought that the commission structure for MRO was "far too high." (Id. 83.) Carhart felt that he "could indeed go forward on [his] own, and [he] did not need anyone's assistance, and [he] also did not need to share with any other party or company." (Id. 82.)

On June 29, 2012, CHI, through its counsel and at Halaska's direction, sent a letter to MRO terminating it ("Termination Letter"). (Carhart Aff., Ex. 2; Halaska Dep. 88-89.) Halaska is not aware of whether Carhart talked to the lawyers about terminating MRO or reviewed the Termination Letter before it was sent. (Halaska Dep. 88, 90.) Carhart testified that he did not see the Termination Letter before it was sent, so he did not approve of the letter or the method used to terminate MRO. (Carhart Dep. 107-08.)

The Termination Letter stated that, "effective immediately, [CHI] will no longer be needing [MRO's] services."  It provided,

> Effective immediately, [MRO] will cease its representation of [CHI] and all other work on [CHI's] behalf in all respects.  This prohibition specifically includes, but shall not be limited to, MRO's representation of [CHI] to any former or current clients of [MRO], including, but not limited to, Terex . . . and American Hydraulics . . . .

CHI agreed to make six monthly payments of $4,000 each to MRO from July 1, 2012 through December 1, 2012, "[i]n consideration of the covenants given by MRO."  The covenants included a "Covenant Not to Compete," "Covenant Not to Disclose," and a "Mutual Release" of all claims.

MRO received the Termination Letter on July 1, 2012.  (Oldenburg Dep. 57-58.)  Oldenburg called Carhart and said, "[T]his is not right, the termination was drawn up by Halaska, that termination was wrong. . . .  I'm owed commissions." (Id. 81-82.)  Carhart told Oldenburg that he agreed with Oldenburg "because he said he was totally against the termination of [Oldenburg]."  (Id. 83.)

According to Halaska, Carhart was in charge of all financial affairs for CHI.  (Halaska Dep. 37-38.)  Carhart testified that, in August 2012, he made the decision that CHI would not pay MRO.  (Carhart Dep. 139.)  Carhart also testified that there were no funds to pay MRO from CHI for September, October,

9

and November 2012.  (Carhart Dep. 141.)  According to Carhart, CHI did not

have any money coming in from customers.  (Id. 141-42.)  Part of the reason that

CHI did not have funds was because, starting in July 2012, Carhart, Inc. began

doing business directly with Terex; as business between Carhart, Inc. and Terex

increased, business between CHI and Terex declined.  (Carhart Dep. 75, 142.)

### 4.      Commission Calculations by Carhart and MRO

According to Carhart, CHI owed MRO $18,584.63 for commissions on

products paid for by customers as of June 30, 2012, and an additional $7,492.83

for commissions in July 2012.  (Carhart Aff., Ex. 3.)  Also according to Carhart,

MRO did not receive any commission checks in June or July 2012.  (Carhart Aff.,

Ex. 1.)  On August 8, 2012, CHI paid the commissions owing to MRO through

two checks totaling $26,644.50.  (Id.)

Carhart also claims that, from August 2012 through December 2012, CHI

collected $1,753,368.10 from Terex and American Hydraulics for products sold by

MRO.  (Carhart Aff., Ex. 4.)  MRO calculates that, based on the commission

percentages previously agreed to by CHI, MRO was entitled to commissions of

$56,345.40 for that time period.  (Id.)

Carhart asserts that CHI collected $552,369.60 from January 2013 to February 2013.  (Id.)  He concludes that MRO is owed commissions of $19,749.30 for that time.  (Id.)  He asserts that CHI has made no further commission payments to MRO since August 8, 2012.  (Carhart Aff., Ex. 1.)

The documents attached to the Carhart Affidavit calculating CHI sales and MRO commissions lack relevant details such as who prepared the documents, how and when the documents were prepared, which customers are listed, what the particular items ordered are, and which entity fulfilled the order.  Carhart's affidavit does not address these issues.  Without additional testimony or documentation, the Court cannot determine the accuracy of these documents, the foundation of the documents, or how much MRO earned in commissions from CHI.

### B.      Procedural History

On September 18, 2012, MRO filed a Complaint against CHI in this Court. The Complaint alleges Count 1: Violation of Minn. Stat. § 325E.37; Count 2: Breach of Contract; and Count 3: Violation of Minn. Stat. § 181.145.

On October 12, 2012, while Carhart was still a Manager of CHI, Carhart and MRO entered into an assignment agreement under which Carhart, Inc. made payments to MRO in exchange for which Carhart personally took an assignment

11

of any of MRO's claims against CHI for the alleged failure to pay sales

commissions under the sales representative agreement.  (Carhart Dep. 153, 157;

[Docket No. 32-1] Ex. 2, Apr. 13, 2013 Carhart Aff., Ex. B, Assignment.)  The

assignment of claims was to Carhart individually, even though Carhart, Inc. had

paid for the assignment.  (Id.)  Carhart estimates that he paid $150,000 for the

assignment, plus MRO's attorneys' fees, and MRO states that it was paid $80,000.

(Carhart Dep. 152; Oldenburg Dep. 87-89.)  Oldenburg does not "keep any

records."  (Oldenburg Dep. 87.)

Near the end of October 2012, Carhart resigned from CHI.  (Carhart Dep.

141.)

On October 30, 2012, CHI and Halaska International, Inc. sued Carhart and

Carhart, Inc. in Wisconsin state court alleging Count 1: Breach of Contract; Count

2: Breach of Fiduciary duty; Count 3: Conversion; Count 4: Breach of Duty of

Good Faith; Count 5: Inspection of Records; Count 6: Declaratory Judgment

Pursuant to Wisconsin Statute § 806.04 as to Non-compete Provision of the CH[I]

Operating Agreement; and Count 7: Appointment of Temporary Receiver.

([Docket No. 37] Liesinger Aff., Ex. A, Compl., Carhart-Halaska Int'l, LLC v.

Carhart, Inc., 12CV0613 (Wis. Cir. Ct., Ozaukee County).)   These claims arise

from the Operating Agreement between Carhart, Inc. and Halaska International, Inc.  The case was removed to the U.S. District Court for the Eastern District of Wisconsin ([Docket No. 32] Ex. 3, Feb. 5, 2013 E.D. Wis. Order.)  On February 5, 2013, the Wisconsin federal court remanded the matter back to state court because both CHI and Carhart, Inc. are citizens of Illinois.  (Id.)

In this case, on May 1, 2013, CHI and Halaska International, Inc. moved to amend CHI's Answer, add Carhart and Carhart, Inc. as Third-Party Defendants, and join Halaska International, Inc. as a Third-Party Plaintiff.  [Docket No. 29] On June 27, 2013, the Court granted in part and denied in part that motion.  The Court denied the request to add claims of estoppel, breach of fiduciary duty, breach of the duty of good faith, and breach of contract on the grounds that those claims were not dependent on the outcome of the claims asserted by MRO against CHI.  The Court granted the request to add a claim for indemnification against Carhart on the basis that CHI incurred liability because Carhart breached his contractual duty as the operating Manager of CHI to pay commissions to MRO.  The Court reasoned that this claim arises from and relates to MRO's original claims and is not futile.  The Court denied Halaska International, Inc.'s motion to intervene as a Third-Party Plaintiff because Halaska International, Inc.

13

is not subject to a direct risk of liability to MRO.  Also, "to the extent possible,

disputes between [CHI and Halaska International, Inc. on one side and Carhart,

Inc. and Carhart on the other] are better resolved in that forum [the Wisconsin

Litigation]."  (Id. at 9.)

On July 8, 2013, CHI filed its Amended Answer and Third Party

Complaint against Carhart.  [Docket No. 52]  CHI asserts Count 1:

Indemnification by CHI Against Mr. Carhart.

MRO now asserts that the Court should grant summary judgment to it on

all three claims that it has asserted against CHI, and Carhart asserts that CHI's

Third-Party claim for indemnification against him should be denied as a matter

of law.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case." Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

**B.      Count 1: Violation of Minn. Stat. § 325E.37**

**1.      Minnesota Law Regarding Termination of Sales Representatives**

The Minnesota Termination of Sales Representatives Act provides:

> A manufacturer, wholesaler, assembler, or importer may not
> terminate a sales representative agreement unless the person has
> good cause and:
>
> > (1) that person has given written notice setting forth the
> > reason(s) for the termination at least 90 days in advance of
> > termination; and
> >
> > (2) the recipient of the notice fails to correct the reasons stated
> > for termination in the notice within 60 days of receipt of the
> > notice.

Minn. Stat. § 325E.37, subd. 2(a). "Good cause" "means . . . in absence of a

written agreement, failure by the sales representative to substantially comply

with the material and reasonable requirements imposed by the manufacturer,

wholesaler, assembler, or importer." Id., subd. 1(b). The statute further states

that "a sales representative agreement of indefinite duration shall be treated as if

15

it were for a definite duration expiring 180 days after the giving of written notice

of intention not to continue the agreement." Id., subd. 3.

> If a sales representative is paid by commission under a sales
> representative agreement and the agreement is terminated, the
> representative is entitled to be paid for all sales as to which the
> representative would have been entitled to commissions pursuant to
> the provisions of the sales representative agreement, made prior to
> the date of termination of the agreement or the end of the
> notification period, whichever is later, regardless of whether the
> goods have been actually shipped.  Payment of commissions due the
> sales representative shall be paid in accordance with the terms of the
> sales representative agreement or, if not specified in the agreement,
> payments of commissions due the sales representative shall be paid
> in accordance with section 181.145.

Id., subd. 4.

A sales representative may also claim reasonable attorneys' fees and costs

and damages beyond the 180-day notice period.  See Wingert & Assocs., Inc. v.

Paramount Apparel Int'l, Inc., 458 F.3d 740, 744 (8th Cir. 2006).

### 2.    Analysis

MRO argues that the Termination Letter, drafted by the von Briesen &

Roper law firm at Halaska's direction, violated Minnesota Statute § 325E.37 by

purporting to terminate MRO's indefinite sales representative agreement

"effective immediately."  It asserts that, under the statute, CHI was required to

give 180 days' notice before termination.  It further claims that, under the statute,

MRO is entitled to commissions for all customer payments received by CHI from July 2012 through December 2012; lost profits based on commissions for products already ordered before termination; and attorneys' fees and costs expended in collecting the amounts due.  In total, it asks that the Court enter summary judgment for $76,085.70 plus attorneys' fees and costs.

The Court denies summary judgment on Count 1 because it is unclear what amount, if any, MRO should be paid.  The evidence in the record is conflicting regarding the amount of sales made to CHI during the 180-day notice period and beyond, the amount of sales stemming from MRO's actions, and the percentage commission to which MRO was entitled under the oral agreement. The financial documents attached to Carhart's affidavit lack foundation and they fail to label the author, the customers, or the products.  As CHI points out, it is not clear whether the customer payments were paid to CHI or to Carhart, Inc. The documents are insufficient to show, as a matter of law, what percentage of commission MRO should be paid and on which sales.  Moreover, the deposition testimony on these points is conflicting and vague.  For example, Carhart testified that there were no funds with which to pay MRO during the fall and winter of 2012 and no money was collected from customers.  The question of

whether CHI did or did not receive payment from customers is material because

there is conflicting evidence regarding whether MRO earned a commission when

an order was placed or only once payment was actually received by CHI from

the customer.  Furthermore, the parties agree that the percentage commission

paid to MRO varied with each order, yet the parties fail to direct the Court to

evidence in the record specifically tying a particular percentage to any of the

orders for which MRO was allegedly not paid.  There remain key fact questions

for trial, including the amount that CHI was paid during the six months after

MRO's termination and the amount that was ordered from CHI during that

period.

### C.      Count 2: Breach of Contract

#### 1.      Procuring Cause Doctrine

"A claim of breach of contract requires proof of three elements: (1) the

formation of a contract, (2) the performance of conditions precedent by the

plaintiff, and (3) the breach of the contract by the defendant."  Thomas B. Olson

& Assocs., P.A. v. Leffert, Jay & Polglaze, P.A., 756 N.W.2d 907, 918 (Minn. Ct.

App. 2008) (citations omitted).

MRO argues that "when a commissioned salesperson has been the

procuring cause of a sale, the employer cannot avoid paying the commission that

was earned by opportunistically terminating the employee or preventing the

employee from doing whatever else might be required to perfect his or her right

to the commission." Galbraith v. U.S. Premise Networking Servs., Inc., No. A03-

1154, 2004 WL 1049042, at *2 (Minn. Ct. App. May 11, 2004) (unpublished) (citing

Gunderson v. N. Am. Life & Cas. Co., 78 N.W.2d 328, 332 (Minn. 1956)).  "The

procuring-cause doctrine is designed to fill gaps—gaps that exist because a

salesperson was working without a contract, or because the contract under

which a salesperson was working did not address his or her entitlement to

commissions after termination."  N. Coast Technical Sales, Inc. v. Pentair

Technical Prods., Inc., No. 12–CV–1272 (PJS/LIB), 2013 WL 785941, at *7 (D.

Minn. Mar. 4, 2013).

MRO concludes that, here, the procuring cause doctrine can be used to fill

the gap in the oral sales representative agreement so that MRO is entitled to

commissions for sales to Terex and American Hydraulics when it was the

procuring cause of those sales.

### 2.    Analysis

The Court denies summary judgment on Count 2.  The procuring cause

doctrine may apply in a case such as this, in which a sales representative is

terminated but there is no contract delineating the sales representative's right to

commissions after termination.  However, the record is unclear regarding which

sales to CHI would fall under this doctrine such that MRO is entitled to a

commission.  Carhart testified that no money came in from customers during the

fall and winter of 2012.  This conflicts with the documents attached to Carhart's

affidavit that purport to show hundreds of thousands of dollars' worth of sales

during that time period.  As the Court noted with respect to Count 1, there is

conflicting evidence regarding when MRO earned a commission for sales by

CHI.  Also, because there is testimony that, during this time period, Carhart, Inc.

started to deal directly with the customers, cutting out CHI, it is not clear that the

sales listed on the documents were sales to CHI as opposed to sales directly to

Carhart, Inc.  Given the material facts remaining, summary judgment would be

inappropriate.

 **D. Count 3: Violation of Minn. Stat. § 181.145 for Failure to Promptly Pay Commissions at Termination**

  **1. Statutory Requirements under § 181.145**

Minnesota Statute § 181.145 requires prompt payment of commissions to a

salesperson upon separation from employment.  Specifically:

> When any person, firm, company, association, or corporation
> employing a commission salesperson in this state terminates the

> salesperson . . . the employer shall promptly pay the salesperson, at the usual place of payment, commissions earned through the last day of employment . . . .
>
> If the employer terminates the salesperson . . . the employer shall pay the salesperson's commissions earned through the last day of employment on demand no later than three working days after the salesperson's last day of work.

Minn. Stat. § 181.145, subds. 2(a), (b).  "'[C]ommissions earned through the last day of employment' means commissions due for services or merchandise which have actually been delivered to and accepted by the customer by the final day of the salesperson's employment."  Id., subd. 1.

The penalty for violating the duty to promptly pay commissions is the commissions due plus 1/15 of the unpaid commissions each day that the employer is late, not to exceed 15 days.  Id., subd. 3.  An employer's offer to pay a former salesperson the exact amount of commissions owed "contingent upon [the salesperson's] release of further claims of commissions, as a matter of law does not comply with the provisions in Minn. Stat. § 181.145."  Dougan v. Niedermaier, 419 N.W.2d 112, 115 (Minn. Ct. App. 1988).

### 2.    Analysis

The Court denies summary judgment on Count 3.  MRO has a strong argument that CHI failed to promptly pay commissions owed as of the date of

21

termination because it did not pay any amount of commissions owed until August 8, 2012, and, instead, first offered contingent payments of $4,000 per month.  However, as the Court has discussed with regard to Counts 1 and 2, the record is vague and conflicting, so it cannot be determined what amount of commissions had been earned by, but not paid to, MRO through the date of termination.  Moreover, the record does not definitively demonstrate whether the money paid to MRO on August 8, 2012 represented commissions that were already earned as of the day of MRO's termination or if that amount includes commissions earned throughout July and the beginning of August.  Thus, the Court cannot enter summary judgment on Count 3.

### E.      CHI's Third-Party Claim for Indemnification

"Indemnity . . . arises out of a contractual relationship, either express or implied by law, which requires one party to reimburse the other entirely." Blomgren v. Marshall Mgmt. Servs., Inc., 483 N.W.2d 504, 506 (Minn. Ct. App. 1992) (citation omitted).

In the June 27, 2013 Order, the Court held that "CHI has stated a very limited claim for indemnification: that CHI may have incurred liability because Mr. Carhart allegedly breached his contractual duty as the operating manager of CHI to pay commissions to MRO."  (June 27 Order at 7 (footnote omitted).)

The Court denies Carhart's motion for summary judgment.  Under the Operating Agreement, Carhart indisputably had the authority to pay MRO's commissions.  And the parties agree that, in practice, Carhart – and his wife – had the responsibility of actually paying the commission checks; Halaska's duties with regard to commissions were to negotiate the amount and to tell Carhart the amount that should be paid.  Carhart testified that, in August 2012, he made the decision that CHI would not pay MRO.  Additionally, under the Operating Agreement, as a Manager, Carhart had the duty to "take all action that may be necessary or appropriate [] for [CHI's] day-to-day operation and business in accordance with the provisions of this Operating Agreement and the applicable laws and regulations."  (Operating Agreement § 5.5(a).)  There is evidence that Carhart violated that duty by failing to pay MRO's commissions. There is also evidence in the record to support CHI's claim that CHI's failure to pay MRO's commissions was a cause of liability in this current lawsuit. Moreover, although, according to Oldenburg, Carhart told him that he was "totally against the termination" (Oldenburg Dep. 83), in Carhart's deposition, he testified that terminating MRO "was my opinion and my decision" (Carhart Dep. 80).  At this stage, the indemnification claim survives.

**F.    CHI's Affirmative Defenses**

Because the Court has denied summary judgment on all claims, it need not

reach the issue of CHI's affirmative defenses.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

> Plaintiff and Third-Party Defendant's Motions for Summary
> Judgment [Docket No. 54] is **DENIED**.

Dated:   October 25, 2013                          s/ Michael J. Davis
                                                   Michael J. Davis
                                                   Chief Judge
                                                   United States District Court